**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

GABRIEL DYLAN HALEY,

Petitioner,

vs.

A.K. SCRIBNER, et al.,

Respondents.

______________________________/

No. CIV S-05-0702-MCE-CMK-P

FINDINGS AND RECOMMENDATIONS

Petitioner, a state prisoner proceeding with appointed counsel, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Pending before the court are petitioner's pro se petition for a writ of habeas corpus (Doc. 1), filed on April 11, 2005, respondent's answer (Doc. 34), filed on July 6, 2006, and petitioner's reply (Doc. 37), filed by counsel on September 7, 2006.

/ / /

/ / /

/ / /

/ / /

/ / /

## I. BACKGROUND

### A. Facts[1]

The state court recited the following facts, and petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

> On June 22, 1996, the Lassen County Sheriff's Department received a call about a dead body found in a ravine near Shaffer Mountain Road in Lassen County. Deputies dispatched to the scene discovered the partially decomposed body of 18-year-old William Timms.
>
> An autopsy revealed that Timms had been killed approximately three days prior to the discovery of his body. The cause of death was listed as a severe cranial trauma, the result of substantial blunt force applied to the skull. Timms's hands and wrists showed signs of defensive injuries, presumably suffered when he attempted to ward off the blows to his body. Timms also suffered a gunshot wound to the abdomen; however, the wound was not deemed immediately fatal.
>
> *The Prosecution's Case*
>
> The People's theory was that Timms was murdered over an automobile -- a used BMW -- which Haley had purchased from Timms, but for which a $1,500 balance was still due. Haley was incensed at Timms's persistent demands for the money still owed him, and wanted to put an end to the demands. Haley's friend Ladner agreed to help "persuade" Timms not to insist on the remaining payments. The form of the persuasion was to be murder, according to the prosecution.
>
> Two months after the discovery of Timms's body, Jean O'Shea, Ladner's girlfriend (and the prosecution's star witness), then living in Oregon, telephoned the Lassen County Sheriff's Department and stated that she had information about Timms's murder. Over a series of interviews, she explained to law enforcement authorities how Timms met his untimely death.
>
> In May 1996, O'Shea had met Ladner, who was unemployed, at a club in Salt Lake City. They began living together. O'Shea and Ladner decided to take a trip to Susanville so that Ladner could visit his young son and the boy's mother, Amanda Phearson. In early June 1996, the couple drove in O'Shea's Toyota to Susanville, where they stayed with Haley, a friend of Ladner's.
>
> Haley's apartment complex only permitted guests to remain for a maximum of two weeks. Thus, after O'Shea and Ladner's two-week stay had passed, O'Shea and Ladner relocated to Phearson's apartment.

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct." Petitioner bears the burden of rebutting this presumption by clear and convincing evidence. See id. These facts are, therefore, drawn from the state court's opinion(s), lodged in this court. Petitioner may also be referred to as "defendant."

Around Father's Day, June 16, 1996, O'Shea's car broke down. Neither she nor Ladner had enough money to fix the car. Instead, they began looking for another car to purchase.

Haley owned a Nissan automobile as well as a blue BMW he had recently purchased from Timms for $3,000. Haley had paid Timms $1,500 with the understanding that he would make payments on the balance. When Haley failed to make these payments, Timms began to press Haley for the money. Haley was upset because he suspected the BMW had been in a wreck - - a fact not disclosed by Timms at the time of the sale -- and was incensed at Timms's persistent demands for the money. He wanted to put an end to the demands.

When O'Shea's vehicle broke down, Haley offered to sell his car for $3,000 "unless there was some way [he] could get Bill Timms out of the picture." In that case, Haley would accept a "different deal" whereby he could sell the car for $2,000, making a $500 profit. Ladner liked the BMW and wanted to buy it.

On June 17, 1996, O'Shea and Ladner visited Haley at his apartment. Although it was unusual for O'Shea to be excluded from any conversation in which Ladner participated, O'Shea was excluded from a private conversation that the defendants held in the bedroom during the visit.

Following the private discussion, defendants[2] directed O'Shea to go with them for a ride. When O'Shea queried defendants about their destination, she was told not to ask any questions. During the drive, defendants conversed not only about getting Timms "off" of Haley's back, but also about finding a remote location to which they might bring Timms. They settled on a remote location around Shaffer Mountain, a spot far away from any main roads.

Based on defendants' comments in the car, O'Shea gathered that the purpose of the trip was to find a remote spot where the group could bring Timms and intimidate him, such as by beating him up, so that he would get the message that he should stop harassing Haley over the money owed on the BMW.

When the discussion turned to how the group might lure Timms to the Shaffer Mountain site, O'Shea suggested telling Timms the trio was involved in a drug deal. If Timms would assist in retrieving the drugs from a hidden location near Shaffer Mountain, he could get the money he was owed by Haley a lot sooner. Both defendants liked the idea.

Two days later, on June 19, Ladner called O'Shea and told her that Timms had arrived at Haley's apartment. Ladner said, "We're going to do this now, be ready to go, we're on our way." Defendants and Timms picked up O'Shea, and drove in Haley's Nissan to the area that defendants and O'Shea had selected on Shaffer Mountain. During the drive, Ladner adroitly parried Timms's questions about the drug deal.

Haley stopped the vehicle at the Shaffer Mountain location. Everyone got out. Ladner asked Haley to open the trunk, and Ladner removed a shotgun that O'Shea had previously observed in Haley's apartment. Timms asked about the need for a shotgun. Ladner responded

---

[2] Petitioner and Ladner were tried together.

that they might encounter snakes along the trail.

The group began walking down into the canyon, with Ladner leading the way. Suddenly, Ladner turned and pointed the shotgun at Timms, firing a single blast which struck Timms in the stomach. Timms remained standing, looked at Ladner, and asked, "'Why?'" Ladner did not respond. Instead, he grabbed the shotgun by the barrel and began swinging it at Timms, striking him several times. O'Shea and Haley watched as Ladner pummeled Timms with the shotgun. Putting every ounce of physical effort into the assault, Ladner used such force that the stock of the shotgun broke. In all, Ladner struck Timms between five and ten times in and about the head area.

Ladner's blows sent Timms to the ground, where he curled up in a fetal position. However, Timms was still alive. Accordingly, Ladner picked up a large rock and used it to crush Timms's skull. Ladner then took Timms's wallet and handed it to O'Shea. Afterwards, Ladner picked up the shell casings and pieces of the wooden stock.

Defendants and O'Shea returned to Haley's vehicle. Haley reopened the trunk, and Ladner took out O'Shea's white afghan, wrapped the shotgun in it, and put the gun back in the trunk. Haley turned the car around, and Ladner and O'Shea erased the tire tracks left by the vehicle.

After driving away from the canyon, the trio discussed disposing of the evidence. Ladner wanted to throw the shotgun into a nearby lake, but was overruled by Haley who claimed the lake was too shallow. The group decided to drive to Reno and dispose of the evidence there. They discarded most of the contents of Timms's wallet out the window as they drove to Reno. There were a few blood spots on Ladner's shirt, and at his request, O'Shea used water to remove the blood. En route, Ladner remarked how difficult it was to kill Timms, stating, "'That fucker wouldn't die would he. It was hard to kill him.'"

When the group arrived in Reno, they gambled and had drinks and dinner. They then drove to a parking lot and placed some of the evidence in a trash bin. At Ladner's direction, O'Shea burned Timms's driver's license. At a parking lot near a bridge traversing the Truckee River, Ladner took the shotgun, still wrapped in the afghan, and walked toward the bridge. He returned without either the gun or the afghan. Defendants and O'Shea then returned to Susanville.

Two days after the murder, Haley sold Ladner the BMW for $1,200. Ladner gave Haley a down payment of $150 and agreed to make payments on the balance. Haley documented the transaction by drawing up a bill of sale.

On June 24, Ladner and O'Shea left Susanville in the BMW and drove to Long Beach. Once there, Ladner asked a friend if he liked the car, stating "'I had to kill a mother fucker to get these [wheels].'"

While in Long Beach, the BMW disappeared -- stolen, according to Ladner. In the meantime, the relationship between Ladner and O'Shea crumbled. Ladner was physically abusive, and O'Shea became afraid of him. Sometime around mid-July 1996, O'Shea returned to Susanville, and Ladner moved to Texas.

/ / /

> Immediately following her arrival in Susanville, O'Shea was interviewed by sheriff's deputies investigating Timms's murder. O'Shea denied any knowledge of the crime. Consistent with a story that Haley previously gave authorities, O'Shea claimed that Timms had accompanied the group to Reno, but once there went his separate way.
>
> O'Shea's conscience, however, eventually got the better of her. In August 1996, while living in Oregon, she contacted Sergeant Bollinger of the Sheriff's Department and told him that she had information about Timms's murder. Sheriff's deputies returned O'Shea to Susanville, and she led them to the area where Timms had been murdered. She even pointed out the rock that Ladner had used to crush Timms's skull.
>
> O'Shea then escorted the deputies to Reno where she tried to recall the areas where the group had disposed of the evidence. A search of the Truckee River at a location pointed out by O'Shea led to the discovery of both the afghan and what remained of the shotgun.
>
> An examination of the shotgun revealed that the stock was broken off and that the barrel had been bent as a result of extreme force. Human blood was found on the rock that O'Shea identified as the one used by Ladner to crush Timms's skull. However, the blood that remained on the rock was insufficient for identification, although hair found on the rock did match the victim's hair.

The state court then noted in a footnote the following:

> O'Shea had not been charged with any crime as of the time of trial. She testified that she had not been made any promises, i.e., leniency, in return for her testimony. She further testified that she was fully aware that her testimony left her vulnerable to also being charged with Timms's murder.

The state court then outlined the defense theories:

> *Ladner's Defense*
>
> Ladner's defense mirrored the prosecution's case with one significant difference. Testifying on his own behalf, Ladner claimed that it was Haley who retrieved the shotgun from the car, shot the victim, and then beat the victim to death.
>
> Ladner testified that he had had no thoughts whatsoever of killing Timms. It was Haley, upset with Timms's persistence over the balance owed to him, who wanted Timms "out of the picture." The plan conceived by Ladner, Haley and O'Shea was to lure Timms to a remote location, where Ladner would "beat him up." After Timms had been beaten up and forced to walk all the way back to Susanville, he would get the message to stop demanding payment from Haley. With Haley free of Timms's demands, Haley could then sell the BMW to Ladner at a discount.
>
> Ladner was surprised and scared as Haley first shot and then proceeded to beat Timms to death. But Ladner helped clean up the area and dispose of evidence because he believed that his presence implicated him in the crime.

> The defense also called a friend of Ladner's from Long Beach. He testified that O'Shea made threats to "get even with [Ladner]" after the couple broke up. O'Shea reportedly said, "I know something about him that I can just absolutely get him in more trouble than he can believe."
>
> *Haley's Defense*
>
> Haley did not testify, relying instead on O'Shea's testimony that Haley appeared shocked and surprised when Ladner fired at Timms and beat Timms with the shotgun. Haley argued that there was no credible evidence that he had entered into any plan with Ladner to kill Timms. Instead, the decision to kill Timms was made solely by Ladner, who desperately wanted the BMW. Unfortunately from Haley's standpoint, Ladner carried out the killing in such a way -- having Haley drive to Shaffer Mountain, and using Haley's gun -- such that the evidence pointed to Haley as the killer. Haley urged that his only role was that of an accessory after the fact.

**B. Procedural History**

Petitioner was convicted, as was Ladner, of first degree murder. The jury found true the special circumstance allegation of "lying in wait." Both petitioner and Ladner were sentenced to life in state prison without the possibility of parole. On direct appeal, the California Court of Appeal affirmed the convictions and sentences in an opinion issued on September 25, 2000. The California Supreme Court denied direct review without comment or citation.

Petitioner filed a habeas corpus petition in the Lassen County Superior Court on May 4, 2001. In that petition, petitioner raised for the first time the claim that new evidence "casts sever[e] doubts as to the accuracy and reliability of the trial court's judgment of guilt." Petitioner recites the following factual basis for the state habeas petition:

> On February 5, 2001, Petitioner's attorney, Danny D. Brace, Jr., received a hand-written letter from Co-Defendant Ladner. In that letter, Co-Defendant Ladner admits to having committed perjury during the consolidated jury trial. After investigating the issues raised in Co-Defendant Ladner's letter, counsel obtained a signed declaration from Co-Defendant Ladner completely exonerating Petitioner of any knowledge, intent, planning or involvement in the crime he was convicted of and is incarcerated for. Contrary to his trial testimony implicating Petitioner, Co-Defendant Ladner confesses to being completely and individually guilty of committing the murder. Additionally, Co-Defendant Ladner attests that during pretrial discussions with his attorney, Rex Gay, he informed his attorney that he and he alone had committed the murder. Co-Defendant Ladner states in his declaration that his attorney advised him that his only

> defense was to testify, albeit falsely, at their consolidated trial that Petitioner had committed the murder in hopes of confusing the jury and raising a reasonable doubt as to which of the co-defendants actually committed the murder.

The Superior Court denied the petition in a reasoned decision issued on July 11, 2001. The court concluded that Ladner's new declarations made no difference because it was O'Shea's testimony which convicted petitioner, not Ladner's. Both the California Court of Appeal and California Supreme Court denied subsequent state habeas petitions without comment or citation.

## II. STANDARDS OF REVIEW

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable. See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998). The AEDPA does not, however, apply in all circumstances. When it is clear that a state court has not reached the merits of a petitioner's claim, because it was not raised in state court or because the court denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal habeas court must review the claim de novo. See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach petitioner's claim under its "re-litigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing petition de novo where state court had issued a ruling on the merits of a related claim, but not the claim alleged by petitioner). When the state court does not reach the merits of a claim, "concerns about comity and federalism . . . do not exist." Pirtle, 313 F. 3d at 1167.

/ / /

Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F. 3d 1223, 1229 (9th Cir. 2001).

Under § 2254(d), federal habeas relief is available where the state court's decision is "contrary to" or represents an "unreasonable application of" clearly established law. In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the Court), the United States Supreme Court explained these different standards. A state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme Court on the same question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. See id. at 405. A state court decision is also "contrary to" established law if it applies a rule which contradicts the governing law set forth in Supreme Court cases. See id. In sum, the petitioner must demonstrate that Supreme Court precedent requires a contrary outcome because the state court applied the wrong legal rules. Thus, a state court decision applying the correct legal rule from Supreme Court cases to the facts of a particular case is not reviewed under the "contrary to" standard. See id. at 406. If a state court decision is "contrary to" clearly established law, it is reviewed to determine first whether it resulted in constitutional error. See Benn v. Lambert, 293 F.3d 1040, 1052 n.6 (9th Cir. 2002). If so, the next question is whether such error was structural, in which case federal habeas relief is warranted. See id. If the error was not structural, the final question is whether the error had a substantial and injurious effect on the verdict, or was harmless. See id.

State court decisions are reviewed under the far more deferential "unreasonable application of" standard where it identifies the correct legal rule from Supreme Court cases, but unreasonably applies the rule to the facts of a particular case. See id.; see also Wiggins v. Smith, 123 S.Ct. 252 (2003). While declining to rule on the issue, the Supreme Court in Williams, suggested that federal habeas relief may be available under this standard where the state court either unreasonably extends a legal principle to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. See Williams, 529 U.S. at 408-09. The Supreme Court has, however, made it clear that a state court decision is not an "unreasonable application of" controlling law simply because it is an erroneous or incorrect application of federal law. See id. at 410; see also Lockyer v. Andrade, 123 S.Ct. 1166, 1175 (2003). An "unreasonable application of" controlling law cannot necessarily be found even where the federal habeas court concludes that the state court decision is clearly erroneous. See Lockyer, 123 S.Ct. at 1175. This is because ". . . the gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." Id. As with state court decisions which are "contrary to" established federal law, where a state court decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless unavailable if the error was non-structural and harmless. See Benn, 283 F.3d at 1052 n.6.

The "unreasonable application of" standard also applies where the state court denies a claim without providing any reasoning whatsoever. See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000). Such decisions are considered adjudications on the merits and are, therefore, entitled to deference under the AEDPA. See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982. The federal habeas court assumes that state court applied the correct law and analyzes whether the state court's summary denial was based on an objectively unreasonable application of that law. See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

## III. DISCUSSION

Petitioner raises one claim – the same claim presented to the state courts in his habeas petitions – that the new Ladner declarations show his actual innocence.[3] The declarations are part of the record before this court and reveal that Ladner now alleges as follows:

1. The testimony Ladner gave at trial regarding petitioner's involvement in the murder was false;
2. Petitioner did not participate in or plan any of the events that led to Timms' death;
3. Ladner was solely responsible;
4. It would have been impossible for petitioner to have known about Ladner's plan to murder Timms because "I acted alone and spontaneously and at no point in time did I ever inform or indicate to Gabriel Haley in any way that I intended to shoot or kill Mr. Timms;"
5. The private conversation with petitioner in the weeks prior to the murder was about drugs;
6. Petitioner, Ladner, and O'Shea did go to Shaffer Mountain, but only "to party;"
7. When petitioner, Ladner, and O'Shea returned to Shaffer Mountain with Timms, it was petitioner's understanding that they were going back "to party again;"
8. Petitioner had no idea Ladner would use the shotgun to shoot Timms; and
9. Ladner lied at trial because he was angry with petitioner for telling the police anything about what had happened on Shaffer Mountain and because of advice of counsel.

The Lassen County Superior Court – the only court to address petitioner's claim in a reasoned decision – rejected the significance of the declarations. In its decision, the state court concluded:

> Nothing is presented by the petition (even were the proffered declarations evidence) which would undermine the prosecution's entire case (citation omitted). It is not sufficient that the evidence might have weakened the prosecution's case or presented a more difficult question for the trier of fact (citation omitted). This court will not accept petitioner's

---

[3] Petitioner had also raised a claim in his pro se petition challenging O'Shea's testimony. That claim has been withdrawn by appointed counsel.

> invitation to pick and choose among Ladner's various stories, of which [the declarations] are only the latest version, (see Defendant's Exhibit F at trial, introduced by petitioner's own counsel, in which Ladner asserts he was not present at the murder scene). The allegations of the petition at best present a conflict over the existence of a plot between Ladner and petitioner. This conflict existed at trial; neither Ladner nor petitioner has ever admitted to such plot. Ladner's present assertion of his own perjury in no way lessens the weight of O'Shea's testimony of the plot.

In the instant case, petitioner's counsel argues that, at a minimum, an evidentiary hearing is required to assess Ladner's credibility. In making this argument, petitioner appears to assert that the state court's denial of his claim was based on its assessment of Ladner's credibility, which petitioner contends was made without an evidentiary hearing in state court. Petitioner asserts that "the superior court concluded, inexplicably, that the Ladner declarations would not undermine the prosecution's entire case."

The court does not agree with petitioner that the state court's conclusion was "inexplicable." To the contrary, the state court explained that it rejected the importance of the new Ladner declarations because they did nothing to undermine O'Shea's trial testimony. As to O'Shea's testimony and its paramount importance in establishing guilt, the California Court of Appeal's opinion on direct appeal is illuminating. In the context of a challenge to the denial of a motion to sever the trials of petitioner and Ladner, the Court of Appeal noted that it was undisputed that both petitioner and Ladner participated in the murder and observed:

> . . . [T]he prosecutor did not sit back and let defendants convict each other. Instead, the prosecution, through O'Shea's testimony (which would have been introduced at either trial), presented its case against both defendants. That presentation, not Ladner's testimony (which sought to put the shotgun in Haley's hands, and which the jury rejected), convicted defendants. [¶] . . . Here, . . . the defense positions were antagonistic because the identity of the killer was disputed by defendants. That each was involved in the incident was undisputed, however, and the prosecution had offered evidence [primarily through O'Shea] sufficient to support verdicts convicting both defendants. As the People observe, this was not a case in which only one defendant could be guilty. The prosecution did not charge both and leave it to the defendants to convince the jury that the other was that person. Here the prosecution theory was that both defendants participated in, and were guilty of, the murder.

In the context of petitioner's claim on direct appeal that the evidence was insufficient to support his conviction, the state court offered the following additional comments on O'Shea's testimony, which was the foundation for the prosecution's case:

> The evidence is undisputed that Haley was upset with Timms's repeated requests for the balance owed on the BMW. There is likewise no dispute that Ladner wanted the BMW, and that Haley was more than willing to accommodate Ladner if Timms was out of the picture. The clear inference from O'Shea's testimony is that Ladner and Haley hatched a plan to kill Timms and leave his body in a location so remote that it was unlikely to be discovered for a long time, if ever. With Timms out of the way, Haley was free to sell the BMW to Ladner.
>
> Haley argues that there is no evidence that he "'knew what was going to happen' but if he did[,] then he was too frightened and otherwise powerless to stop it." However, to the contrary, O'Shea testified that defendants both engaged in a private conversation shortly before she, Haley, and Ladner scouted out the remote location near Shaffer Mountain Road. O'Shea also testified that both defendants liked the idea of luring Timms to the remote location with the phony drug story. There was no reason to scout out a remote area and then take the victim to that remote location if the plan was simply to rough him up. There was even less reason to believe that following such a beating, Timms would have been content to forget about both the assault in the money owed him. The evidence and the reasonable inferences drawn therefrom support the jury's verdict of first degree murder against Haley.

This court agrees with the state courts that there is nothing in the new Ladner declarations which would undermine O'Shea's testimony, with the possible except of Ladner's current statement that the private conversation referred to by O'Shea was not about a plot to kill Timms. O'Shea's testimony on that point, however, was subject to thorough cross-examination by petitioner's counsel at his trial and, following presentation of the evidence, the jury chose to believe O'Shea. The new Ladner declarations simply do not establish petitioner's actual innocence.

As to respondents' suggestion that petitioner's claim is not cognizable because the United States Supreme Court has never acknowledged a free-standing claim of actual innocence as a basis for federal habeas relief, this court will take the same approach the Supreme Court did in House v. Bell, 126 S.Ct. 2064 (2006), the case cited by respondents in support of their argument. Specifically, the Court in House stated that the threshold for any free-standing actual

innocence claim would be "extraordinarily high" and held: "We conclude here . . . that whatever burden a hypothetical free-standing innocence claim would require, this petitioner has not satisfied it." Id. at 2087. Following the Supreme Court's example, this court likewise declines to decide whether a free-standing claim of actual innocence is cognizable. Assuming that it is, the court concludes for the reasons discussed above that petitioner has failed to make the "extraordinarily high" showing required to prevail. The state court's denial of petitioner's claim, therefore, cannot be said to be either contrary to or an unreasonable application of the law.

Finally, the court addresses petitioner's argument that, at a minimum, an evidentiary hearing is required to evaluate Ladner's credibility. An evidentiary hearing is required if: (1) the petitioner's allegations would, if true, entitle the petitioner to relief; and (2) the state court has not, after a full and fair hearing, reliably found the facts. See Jones v. Wood, 114 F.3d 1002, 1010 (9th Cir. 1997). Otherwise, whether to hold an evidentiary hearing is within the discretion of the court. See Townsend v. Smith, 372 U.S. 293, 313, 318 (1963). An evidentiary hearing is not appropriate where there are no disputed material facts or where the claims present purely legal questions. See Harris v. Pulley, 885 F.2d 1354, 1378 (9th Cir. 1988).

The court concludes that an evidentiary hearing is not required because Ladner's declarations do not undermine the basis for his conviction – O'Shea's testimony. Therefore, the first requirement for a mandatory evidentiary hearing is not satisfied in this case. Put another way, the disputed fact – Ladner's credibility – is not material to the constitutionality of petitioner's conviction. For these reasons, the court also sees no purpose in holding a discretionary evidentiary hearing.

/ / /

/ / /

/ / /

/ / /

**IV. CONCLUSION**

Based on the foregoing, the undersigned recommends that petitioner's petition for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 20 days after being served with these findings and recommendations, any party may file written objections with the court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: September 6, 2007.

**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE